# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FINGER LAKES CAPITAL PARTNERS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 9742-VCL |
| HONEOYE LAKE ACQUISITION, LLC, and LYRICAL OPPORTUNITY PARTNERS, L.P., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: August 13, 2015
Date Decided: October 26, 2015

Andrew D. Cordo, Toni-Ann Platia, ASHBY & GEDDES, Wilmington, Delaware; Stuart Kagen, Daniel A. Cohen, KAGEN LAW FIRM, New York, New York, *Attorneys for Finger Lakes Capital Partners, LLC.*

David A. Jenkins, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Bijan Amini, John W. Brewer, Jaime B. Leggett, STORCH AMINI & MUNVES PC, New York, New York, *Attorneys for Honeoye Lake Acquisition, LLC and Lyrical Opportunity Partners, L.P.*

**LASTER, Vice Chancellor.**

Plaintiff Finger Lakes Capital Partners, LLC ("Finger Lakes") is a small and struggling asset management firm. Over the course of a decade, Finger Lakes sponsored investments in five portfolio companies. Each time, Finger Lakes formed a different Delaware limited liability company as a special purpose vehicle for the investment.

Non-party Lyrical Partners, L.P. ("Lyrical") is a large and successful asset management firm. Lyrical acted as Finger Lakes' seed investor. Through defendant Lyrical Opportunity Partners, L.P., Lyrical provided the overwhelming majority of the capital invested through the special purpose vehicles.

Three of the portfolio companies performed terribly. As losses mounted, tensions grew between Finger Lakes and Lyrical. After the relationship soured completely, Lyrical exercised its right to take control of the special purpose vehicles.

One portfolio company achieved a successful liquidity event. Finger Lakes and Lyrical disagreed over how to distribute the proceeds. Because Lyrical had taken control of the entity holding the investment, Lyrical controlled the funds.

Finger Lakes filed this action to compel a distribution of the proceeds in accordance with the entity's operating agreement. Lyrical filed counterclaims to enforce other agreements between the parties that Lyrical believed affected the allocation of proceeds.

This post-trial decision holds that the proceeds must be distributed in accordance with the operating agreement, then reallocated in accordance with their other agreements. In the end, Finger Lakes is not entitled to any of the proceeds from the successful investment. Instead, Finger Lakes is liable to Lyrical for $718,362.25.

1

# I.     FACTUAL BACKGROUND

Trial took place on June 15-16, 2015. The parties submitted over two hundred exhibits and introduced live testimony from four witnesses. The following facts were proven by a preponderance of the evidence.

## A.     Mehta And Shalov Establish Finger Lakes.

Zubin Mehta[1] and Gregory Shalov met while working as junior professionals in the financial services industry. In 2003, with about five years experience each, they decided to start their own asset management company.

Mehta and Shalov raised capital initially from their family and friends. Through an entity called First Finger Lakes Acquisition LLC ("First Finger Lakes"), Mehta and Shalov invested in Tiber Industries, Inc. ("Tiber"), a company that made industrial filters and pumps. Next, Mehta and Shalov began evaluating a potential investment in Performance Trailers, Inc. ("Performance"), a company that designed and manufactured trailers for recreational boats.

In January 2004, Mehta and Shalov were introduced to Jeffrey Keswin by Keswin's sister-in-law, who lived in their apartment building. Keswin has over twenty-five years of experience in the financial industry. He is the principal behind Lyrical, which has approximately $4 billion under management.

---

[1] The financial professional involved in this case is not the famous conductor, nor are they related. Nevertheless, sharing a name with a celebrity does appear to carry some advantages. Part of the consideration Lyrical received for acting as Finger Lakes' seed investor was the right "to use Zubin Mehta's name whenever trying to secure reservations at Manhattan restaurants." JX 220 at 2.

Shalov and Mehta pitched Keswin on their plan to identify and acquire four to five portfolio companies valued in the range of $3-5 million, then manage the companies to generate returns. After the meeting, Shalov and Mehta emailed Keswin to convey their desire to "work together on all of our projects." JX 18 at 1. They explained that by "partnering with one individual," they believed they could devote their time to maximizing the value of the portfolio companies "without having to focus on raising capital." *Id.* Shalov and Mehta suggested an arrangement whereby Lyrical would (i) buy out the investment that First Finger Lakes had made in Tiber at a modest premium, (ii) provide all of the capital for Finger Lakes' anticipated investment in Performance, and (iii) act as Finger Lakes' seed investor going forward. Shalov and Mehta confirmed that Lyrical would have the option, but not the obligation, to invest in future deals: "As you would be our sole source of capital on a deal-by-deal basis, we would contemplate a structure such that we would be obligated to do deals with you, but that you were not necessarily obligated to fund everything we bring you." *Id.*

Keswin contacted Shalov and Mehta's references, who described them as "good guys" who were hardworking and thoughtful. Tr. 8 (Keswin). As a first step in the relationship, Keswin personally made two $200,000 loans to Tiber, which Shalov and Mehta guaranteed.

B.    **The Term Sheet**

In February and March 2004, Shalov, Mehta, and Keswin negotiated a term sheet. They signed the final version in April 2004. JX 220 (the "Term Sheet"). Both sides agree that the Term Sheet was a binding document. They disagree about which provisions

3

continue to govern their relationship and what those provisions entail.

One of the complications for this case is that much of the language of the Term Sheet is ambiguous. This decision has attempted to give meaning to the Term Sheet after taking into account not only its terms and structure but the trial record as a whole.

Contributing to the ambiguity was the parties use of the singular Term Sheet to address multiple topics. One topic was the on-going business relationship between Lyrical and Finger Lakes that would span multiple future investments. A second topic was a specific, near-term investment that Lyrical agreed to make in Performance. In both areas, the terms reflected a bargaining dynamic in which Lyrical had all the advantages: capital, experience, an established reputation, and the ability to choose among eager, young financial professionals hoping to make their bones as asset managers.

The bulk of the Term Sheet addressed the ongoing business relationship between Lyrical and Finger Lakes. For starters, Lyrical received a 25% ownership interest in Finger Lakes. Lyrical also received a right of first refusal on any future investment opportunity that Finger Lakes identified. Although the principals envisioned that Lyrical would make a series of investments with Finger Lakes over time, Lyrical did not actually commit to making a particular amount of capital available. Instead, as Shalov and Mehta had proposed, the Term Sheet gave Lyrical the option to invest in or pass on each deal.

If Lyrical chose to fund a deal, then the Term Sheet established a formula under which Lyrical would receive a portion of the "GM Stake," a term that encompassed both the carried interest in the investment that otherwise would go to Finger Lakes and the management fees that the portfolio company would pay to Finger Lakes. The Term Sheet

4

divided future investments into two groups: (i) those requiring $5 million or more in capital and (ii) those requiring less than $5 million in capital. For the first group, if Lyrical provided at least $5 million or 75% of the total capital required, whichever was less, then Lyrical would receive 49% of the GM Stake; Mehta and Shalov would receive the rest. For the second group, Lyrical's interest varied along a sliding scale depending on the amount of capital it provided:

- If Lyrical was responsible for or committed to provide the entire amount required to complete the investment, or if Finger Lakes' proposed carried interest exceeded 25% of the equity slated for the investors, then Lyrical would receive 25% of the GM Stake and Mehta and Shalov would receive the rest.

- If Lyrical was responsible for or committed to provide more than 50% of the required capital, Lyrical would receive 20% of the GM Stake and Mehta and Shalov would receive the rest.

- If Lyrical was responsible for or committed to provide less than 50% of the required capital, then Lyrical would receive 10% of the GM Stake and Mehta and Shalov would receive the rest.

At the lowest level of investment, when Lyrical provided less than 50% of the required capital, the Term Sheet did not specify whether Lyrical had to invest some capital, or whether Lyrical could receive its 10% even if it passed on the investment and invested nothing. The record as a whole convinces me that to receive a share of the GM Stake, Lyrical had to be responsible for or commit to provide some level of capital. If Lyrical passed on an investment, then Lyrical would not receive any share of the GM Stake.

To ensure that Lyrical received the benefit of its bargain, Shalov and Mehta committed that Finger Lakes "will be the entity through which [they] will conduct their business" and "[t]he economics contemplated by this agreement will substantially survive

5

any structural changes." *Id.* at 2. The Term Sheet capped Shalov and Mehta's annual compensation from Finger Lakes at $150,000 each. If they wanted to make more, then they had to perform well as managers. If their investments generated cash flow sufficient for Finger Lakes to pay dividends to its equity holders, then all of the equity holders—Shalov, Mehta, and Lyrical—would benefit. Given their ownership stakes in Finger Lakes, Shalov and Mehta would receive 75% of the upside, while Lyrical would receive 25%. The Term Sheet contemplated that any payments of returns to the parties exceeding Shalov's and Mehta's salaries of $150,000 "will generally be made as often as practicable, but no less often than annually." *Id.*

The portions of the Term Sheet devoted to the specific investment in Performance applied the general parameters of the relationship to a specific case. The Performance deal called for Lyrical to provide capital of $2 million—the entire amount of capital required to make the investment. In return, Performance would issue a combination of preferred and common stock to Lyrical and Finger Lakes. Lyrical received the preferred stock, which paid a 6% cumulative dividend, and 75% of the common stock. Mehta, Shalov, and Lyrical split the remaining 25% of the common stock, with Mehta and Shalov receiving 75% of the 25% (18.75%) and Lyrical receiving 25% of the 25% (6.25%). This allocation paralleled what would have been the applicable split of the GM Stake (75%/25%) under the Term Sheet's general parameters. The 25% of the common stock that went to Mehta and Shalov constituted their carried interest, and the reallocation of 25% of their share to Lyrical gave Lyrical its 25% of their 25%. The deal terms also called for Lyrical to receive a share of the management fees that Performance paid to

6

Finger Lakes, as well as a share of the management fees being paid to Finger Lakes from its existing investment in Tiber. Finger Lakes would keep the first $325,000 of the fee stream annually. After that, Lyrical and Finger Lakes would split the fees evenly.

In return for granting these extensive rights to Lyrical, Finger Lakes gained access to Lyrical's capital and reputation. Because of Lyrical's resources, Shalov and Mehta would not have to focus on raising capital, and they could cite Lyrical's involvement to enhance their credibility when sourcing investments. The price was high, but it represented the cost of access to the funds Shalov and Mehta needed to launch their own asset management firm. After all, the hardest part of managing money may well be finding the money to manage.[2]

## C. The Performance Agreement

During the negotiations over the Term Sheet, Shalov consulted with an attorney, who recommended that Finger Lakes form a separate LLC for each investment rather than receiving securities directly from the portfolio company. After getting that advice, Shalov and Mehta instructed counsel to prepare an operating agreement for an LLC. It would have been prudent for the parties to have formalized their overarching business deal as well, perhaps in a contract entitled "Framework Agreement" or through a detailed set of corporate governance documents for Finger Lakes. Instead, they continued to rely

---

[2] *See* Daniel A. Strachman, *Getting Started in Hedge Funds* 73 (3d ed. 2011) ("Managing money is hard, and raising money is harder."); John Authers, *Record Hedge Fund Inflows Come at Price*, Fin. Times, Oct. 9, 2013 ("[I]f ever hedge fund managers lie awake worrying at night, it is their attempts to raise funds, rather than to manage money, that worry them.").

on the Term Sheet for the parameters of their ongoing relationship.

The first LLC was the special purpose vehicle used for the investment in Performance. Building thematically on the title of their firm, Shalov and Mehta christened the entity "Canandaigua Lake Acquisition LLC" after one of the Finger Lakes in upstate New York. They followed this convention for later investments in other portfolio companies. For anyone not steeped in the case, this taxonomy produces a confusing array of names that are difficult to remember and harder to pronounce. The following table identifies the five portfolio companies, the abbreviated form used in this decision, and the complete name of the corresponding LLC:

| Portfolio Company | Shortened Name | Special Purpose Vehicle |
|---|---|---|
| Performance Trailers, Inc. | Performance | Canandaigua Lake Acquisition LLC |
| Tiber Industries, Inc. | Tiber | Seneca Lake Acquisition LLC |
| Portadam, Inc. | Portadam | Keuka Lake Acquisition LLC |
| Revolabs, Inc. | Revolabs | Honeoye Lake Acquisition LLC |
| Rethink Autism, Inc. | Rethink | Owasco Lake Acquisition LLC |

For simplicity, this decision refers to each LLC using the shortened name for the portfolio company followed by "Holdings" and to the operating agreement for the LLC using the shortened portfolio company name followed by "Agreement." For example, the first vehicle invested in Performance, so this decision calls the entity "Performance Holdings" and refers to its operating agreement as the "Performance Agreement."

After Mehta and Shalov's counsel prepared the first draft of the Performance Agreement, Shalov sent it to Keswin. He and Lyrical's attorneys made some changes. On April 13, the parties executed it.

The Performance Agreement used a different mechanism than the Term Sheet to

allocate returns on the Performance investment. The Term Sheet contemplated Lyrical holding a mix of preferred and common stock in Performance and Finger Lakes holding common stock. The preferred stock's liquidation preference and priority in the capital structure ensured that any payments to the equity went first to return Lyrical's capital. The Term Sheet contemplated that the preferred stock would pay a 6% cumulative dividend, which gave Lyrical a preferred return on its capital before any profits inured to the common stock. Finger Lakes' carried interest took the form of its shares of common stock, and Lyrical received its allocation of Finger Lakes' carried interest through its ownership interest in Finger Lakes.

The new structure contemplated Lyrical and Finger Lakes receiving membership interests in Performance Holdings, which in turn invested in Performance. Under the Performance Agreement, Lyrical received 395 Class A Membership Interests, and Finger Lakes received five Class B Membership Interests. The two classes of interests were identical, except that for the first four years after the formation of the entity, the Class A interests only could vote on specifically identified matters; otherwise they lacked voting rights. The Class A interests gained full voting rights under certain circumstances, including on the fourth anniversary of the date of formation. At that point, given Lyrical's numerical majority, it would control the entity.

From an economic standpoint, the Performance Agreement specified a distribution of profits and losses that achieved essentially the same economic result as the direct-investment structure contemplated by the Term Sheet. First, members received a return of their invested capital. Second, members received a 6% preferred return on their invested

capital. Third, members received any remaining amounts according to a sharing percentage that reflected Finger Lakes' carried interest. The only new twist was a variable sharing percentage. If the Performance investment yielded an internal rate of return of 15% or greater for the Class A Member (*i.e.*, Lyrical), then the sharing ratio would generate a carried interest for Finger Lakes of 25%. If the investment yielded an internal rate below 15% for the Class A Member, then the sharing ratio would generate a carried interest for Finger Lakes of 15%.

The Performance Agreement included a standard integration clause. It stated:

> **Entire Agreement.** This Agreement and the schedules and exhibits hereto, if any, contain all of the understandings and agreements of whatsoever kind and nature existing between the Members with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, whether oral or written, with respect thereto.

JX 29 at § 9.6. Unfortunately, the parties did not define "the subject matter hereof" or elaborate on the relationship between the Performance Agreement and the multiple topics addressed in the Term Sheet. As to the specific terms and structure of the Performance investment and the relationship "between the Members" of Performance Holdings, the Performance Agreement necessarily took precedence. But the Performance Agreement did not address the ongoing business relationship between Lyrical and Finger Lakes. For example, it said nothing about Lyrical's equity interest in Finger Lakes, Lyrical's on-going right of first refusal, Lyrical's share of the management fees from Performance and Tiber, or the split of the GM Stake for future investments. Nor would it have made sense for the agreement governing one specific investment vehicle to address these matters, which were larger aspects of the ongoing business relationship.

10

At the time, no one thought that the Performance Agreement superseded the Term Sheet in its entirety. Despite not believing that at the time, Mehta and Shalov made arguments to that effect in this litigation.

**D.      The Tiber And Portadam Investments**

In April 2004, Lyrical invested approximately $3.1 million in Tiber. On April 22, the parties formed Tiber Holdings as the vehicle for this investment and executed the Tiber Agreement. The language of the Tiber Agreement tracked the Performance Agreement. Lyrical initially received 134 Class A Membership Interests and Finger Lakes received one Class B Membership Interest.

On September 13, 2004, Mehta approached Keswin about investing in Portadam, a company that made cofferdams. Mehta asked for a $90,000 deposit to secure the deal, which Lyrical provided two days later. On October 7, 2004, Lyrical invested approximately $1.9 million in Portadam. The parties formed Portadam Holdings as the vehicle for the investment and entered into the Portadam Agreement, which tracked the Performance Agreement. Lyrical initially received seventy-eight Class A Membership Interests and Finger Lakes received two Class B Membership Interests.

**E.      Incidents Evidencing The Binding Nature Of The Term Sheet**

As foreshadowed by the discussion of the integration clause in the Performance Agreement, one of the disputes in this case is whether the parties intended for the provisions of the Term Sheet that addressed their ongoing relationship to remain binding after they began forming LLCs whose operating agreements contained integration clauses. In late 2004 and early 2005, several incidents evidenced the parties' continuing

11

belief in the binding nature of the provisions of the Term Sheet that addressed their ongoing relationship.

The first was an email that Mehta sent Keswin on September 30, 2004. The email attached a copy of the Term Sheet and stated, "Here is the agreement that we struck . . . . [T]his does very clearly address the notion and economics of you seeding our fund/company." JX 37 at 1. Mehta would not have sent this email and attached the Term Sheet if he did not believe it represented a still-operative agreement. Shortly thereafter, Lyrical invested in Portadam.

The next was an effort by Mehta and Shalov to renegotiate the original split of management fees. On December 27, 2004, Mehta emailed Keswin about the "current arrangement" that the parties had "negotiated some time back." JX 39 at 1.

> The current arrangement assumes that anything we take in over $325,000 has to be split 50/50 between [Finger Lakes] and [Lyrical], with Lyrical only taking a portion from [Finger Lakes] once [Shalov] and I have taken $150,000 each in salary. On this arrangement, the one thing we'd like to discuss is whether you would be amenable to raising the bar to $400,000 before splitting the fees with [Lyrical]. . . .

*Id.* The email did not lead to any modifications to the $325,000 threshold; however, it shows that Mehta and Shalov thought in December 2004 that this aspect of the Term Sheet remained binding.

Another exchange occurred in early 2005. When preparing Lyrical's audited financial statements for 2004, Lyrical's auditor emailed Keswin to confirm that Lyrical owned a 25% interest in Finger Lakes and to ask whether Finger Lakes could provide "a financial statement of some sort so we can verify that there is minimal value for Lyrical's

12

25% interest." JX 44 at 1. The source of the 25% interest was the Term Sheet, which Lyrical had provided to its auditor. Shalov agreed to send the auditor its financial statements and did not object to the concept that Lyrical had a 25% interest in Finger Lakes. The financial statements contained the following notation: "[Lyrical] . . . entered into an agreement with [Finger Lakes] whereby [Lyrical] received an equity participation in [Finger Lakes] in return for [Lyrical's] purchase of $2,000,000 in [Performance Holdings]." JX 40 at 9.

Yet another incident occurred on November 9, 2005. In an email, Mehta offered Keswin an investment opportunity, stating: "As is part of our overall agreement, I need to either (a) Offer you anything we are doing, as you have a first right of refusal on anything we do or (b) Get you[r] approval for us to do it independently, if you decide to pass." JX 53 at 1. Keswin declined to invest, but the exchange shows that Mehta and Shalov continued to believe the Term Sheet was binding. The right of first refusal appeared in the Term Sheet. By the time he sent his email, Lyrical and Finger Lakes had executed operating agreements governing three special purpose vehicles, each of which contained an integration clause. Yet Mehta and Shalov continued to abide by the sections of the Term Sheet that governed the overarching business relationship.[3]

---

[3] Two similar incidents occurred later in the time line. In 2008, Finger Lakes applied for professional liability insurance. In the application, Finger Lakes represented that an "Agreement with Lyrical Opportunity Partners calls for variable ownership for LOP based on dollars invested with [Finger Lakes] (from 10% to 49%)." JX 87 at 13. The agreement referenced was the Term Sheet, and the variable ownership percentages corresponded to the GM Stake sharing percentages in the Term Sheet. Tr. 262-63 (Mehta). For Finger Lakes' representation in the application to be accurate, the Term

13

**F.      The Clawback Agreement**

By early 2005, Shalov and Mehta came to believe that the seller of Performance had defrauded them. Keswin in turn became concerned about Lyrical's investment in Performance Holdings. The fraud not only meant that Performance was worth less than they believed, but also that Shalov and Mehta needed money if they hoped to save the business and salvage something out of the investment. They approached Keswin about having Lyrical loan $250,000 to Performance.

Sometime in early February 2005, Keswin and Mehta agreed that the loan would have additional protection in the form of a right to claw back the principal from the gains on any other Finger Lakes investment (the "Clawback Agreement"). As Mehta described it in a February 10 email to Keswin, "if [the loan to Performance] disappears and is lost, we would owe you the first $250[,000] we made from any of our other investments." JX 41 at 1. At this point, the Clawback Agreement only covered the principal on the loan.

On March 3, 2005, Lyrical funded the $250,000 loan. More loans followed. During the first nine months of 2005, Lyrical lent a total $2,650,000 to Performance. The promissory note evidencing the loans did not contain an actual clawback that matched Keswin and Mehta's agreement. Instead, it contained an agreement to agree on a

---

Sheet had to remain binding. Mehta and Shalov also represented to the insurer that Lyrical owned a percentage interest in Finger Lakes, a fact which likewise depended on the still-binding nature of the Term Sheet. In 2010, Mehta proposed a new investment to Keswin, explaining that he was obligated "to reach out to [Lyrical] first." JX 134 at 2. Mehta confirmed at trial that this email referenced the right of first refusal contained in the Term Sheet. Tr. 263-64 (Mehta).

clawback. Section 3 stated: "[Finger Lakes] agrees and covenants to the fact that a clawback agreement will be put in place between [Finger Lakes] and [Lyrical] and its affiliates, including but not limited to [Lyrical's] investment in [Portadam Holdings, Performance Holdings, and Tiber Holdings]." JX 42 at 4.

Despite the absence of specific language in the promissory note, the evidence established that the parties had a meeting of the minds on the Clawback Agreement. In addition to his February email, Mehta mentioned it again on July 28, 2005, when requesting an additional loan of $300,000 and an extension of the repayment date for February loan of $250,000. He confirmed to Keswin that "we have already agreed to the following: (1) A guaranteed 20% return on the $850,000 in bridge loans since we met in April, and (2) A full clawback on all of our deals, and (3) In the event there is upside in [Performance], neither Greg or I will get any of our carry for this deal." JX 49 at 1.

## G. The Revolabs Investment

Finger Lakes' next investment was in Revolabs, a company that developed and manufactured wireless conference phones and microphone systems. On August 12, 2005, Lyrical provided $800,000 in capital. Finger Lakes formed Revolabs Holdings, and on October 15, the parties executed the Revolabs Agreement. Shalov and Mehta invested $25,000 personally in Revolabs Holdings, which they later increased to $100,000. Lyrical increased its total investment to $4.6 million.

The Revolabs Agreement tracked the agreements for the previous investment vehicles. Lyrical initially received seventy-nine Class A Membership Interests and Finger Lakes received one Class B Membership Interest. Section 7.1 of the Revolabs Agreement

15

contemplated that available cash would be distributed according to the same priority of payments as in the Performance Agreement: first, the return of invested capital, second, a 6% preferred return on invested capital, and third, the division of any remaining amounts depending on an internal rate of return. If the IRR exceeded 15%, then 75% went to Lyrical and 25% went to Finger Lakes. If the IRR was below 15%, then 85% went to Lyrical and 15% went to Finger Lakes. The parties failed to modify the third stage of the waterfall to reflect Shalov and Mehta's investment of $100,000. The division continued to assume that Finger Lakes had not invested any capital, effectively giving Lyrical 75% or 85% of the returns generated by Shalov and Mehta's $100,000.

Finger Lakes formed two additional entities (Revolabs Holdings II and III) to make follow-on investments in Revolabs. Lyrical opted not to invest in those deals.

## H. The Debt Fund

In early 2006, Finger Lakes formed Finger Lakes Debt Partners (the "Debt Fund") as a means of providing additional funding to Performance, Tiber, and Portadam, which were struggling. The plan was for Lyrical and other investors to capitalize the Debt Fund, which would make loans to the portfolio companies. By providing funding to the companies in the form of secured debt, the investors would have a greater chance of being repaid. Lyrical provided the Debt Fund with $250,000 in equity capital and $3,400,000 in debt financing. Shalov and Mehta raised $575,000 in equity capital from other investors.

Lyrical insisted on two additional protections in the loan agreement that it entered into with the Debt Fund. First, Lyrical bargained for a clawback that would enable

16

Lyrical to recover any losses it suffered on its loans to the Debt Fund from any amounts that Finger Lakes received on its carried interest in the Debt Fund (the "Debt Fund Clawback Agreement"). The Debt Fund Clawback Agreement was separate from the already-existing Clawback Agreement. In practice, the Debt Fund Clawback Agreement provided little protection, because it only extended to the carried interest in the Debt Fund, and Finger Lakes ultimately would receive only $23,025.20 from that source.

Second, Lyrical's loan agreement specified that the Debt Fund only could use the proceeds to "provid[e] fully-collateralized working capital and equipment loans" to Tiber, Portadam, or Performance. JX 227 at 2. Mehta reassured Keswin that the Debt Fund's loans would be "truly [a]sset-backed debt" that would be "lent against . . . [accounts receivable] and inventory" and thus "very secure." JX 71 at 1. In practice, the Debt Fund did not live up to this promise. As Tiber's working capital levels fell, the Debt Fund did not exercise its right to force Tiber to deploy cash generated from accounts receivable or inventory to repay the Debt Fund.

## I.  The Expanded Clawback Agreement

By early 2006, Performance was experiencing serious financial difficulties. In late 2006, Performance agreed to a "friendly foreclosure" with its bank. JX 64 at 1. Mehta told Keswin that the causes included "significant undisclosed vendor debt from the former shareholder" and "theft . . . likely in the order of hundreds of thousands of dollars." *Id*. Both the equity and debt investments in Performance were a total loss.

Shalov and Mehta had guaranteed some of Performance's obligations, leaving them with significant personal liabilities. They considered bankruptcy, but hoped to turn

things around with Finger Lakes' other investments. To pay their creditors, they borrowed money from their parents. They also asked Keswin for a loan. He insisted on Shalov and Mehta providing a personal guarantee and including their investments in Tiber Holdings, Portadam Holdings, and Revolabs Holdings as collateral. They agreed, and Keswin loaned them $400,000. *See* JX 60 (the "Keswin Loan").

By November 2006, Lyrical had invested the following amounts in the LLCs and the Debt Fund:

| Entity | Amount |
|---|---|
| Performance Holdings | $4,050,000 |
| Tiber Holdings | $2,951,802 |
| Portadam Holdings | $3,450,000 |
| Revolabs Holdings | $2,400,000 |
| Debt Fund | $3,650,000 |

At that point, Mehta was seeking more money from Keswin, which ultimately included another $1 million for Revolabs Holdings and $983,886 for the Debt Fund. In exchange for providing the additional money, Keswin insisted on an expanded Clawback Agreement that covered (i) any losses on the equity investments in the LLCs, (ii) $2,650,000 in principal that Lyrical loaned to Performance, and (iii) $983,886 that the Debt Fund loaned to Performance. At the time, the only loss on the equity investments was the $2,450,000 that Lyrical invested in Performance Holdings.

The expanded Clawback Agreement altered the potential for Mehta and Shalov to receive any upside from their investments. As Mehta recognized, it meant that Finger Lakes' investments in the portfolio companies as a whole could be "up 30% and we still end up with nothing." JX 65 at 2.

On December 12, 2006, Mehta promised Keswin that he would work on documenting their various deals, including the expanded Clawback Agreement, and asked for an additional $1 million for Revolabs. Four days later, Lyrical provided the $1 million.

## J.  The Rethink Investment

In April 2008, Mehta asked Keswin to back an investment in Rethink, a company that had developed an online platform to help individuals with special needs. Finger Lakes was behind in its paperwork and had not yet documented the expanded Clawback Agreement. Keswin instructed Jeff Moses, Lyrical's COO, to memorialize it.

Moses asked Finger Lakes to provide a schedule identifying all Lyrical's investments with Finger Lakes, including what was covered by the Clawback Agreement. In response, Mehta provided a list of Lyrical's investments with Finger Lakes and a spreadsheet showing the then-current amount of the "Total Clawback." JX 81 at 2. Mehta calculated that the amount covered was $6,083,886 based on the agreement reached in November 2006.

Mehta's email did not satisfy the Lyrical team. They insisted on more explicit language. Mehta sent a second email, which stated:

> Per the attached schedule, [Finger Lakes] and it's [sic] two Managing Members, Gregory D. Shalov and Zubin Mehta . . . , are agreeing that [Finger Lakes'] entire investment portfolio is subject to a clawback (as is standard for most Private Equity Funds, and is something that the [Managing Member] agreed to earlier with Jeffrey Keswin and [Lyrical]). As it currently stands, [Lyrical] has invested a total of $14,328,270.46 of Equity in four Limited Liability Companies within [Finger Lakes'] investment portfolio, which is further broken down as follows:

19

(1) [Tiber Holdings] -- $3,328,270.46
(2) [Portadam Holdings] -- $3,950,000.00
(3) [Revolabs Holdings] -- $4,600,000.00
(4) [Performance Holdings] -- $2,450,000.00

As of today the Current book basis of [Lyrical's equity] investments [in Finger Lakes' investment portfolio] is $11,878,270.46, with $2,450,000.00 being written off in [Performance Holdings] as a result of the [Performance] Bankruptcy. . . . [A]n additional $983,886.00 was lost in [the Debt Fund] and an additional $2,650,000 was lost in Bridge Loans, both amounts directly attributable to the [Performance] Bankruptcy. As such, [Finger Lakes] currently has a Clawback of $6,083,886.00 that it must make up to [Lyrical]. As such, on the sale of any of the three remaining investments, any dollar of gain between $0 and $6,083,886.00 will go directly to [Lyrical] . . . prior to any Carried Interest being paid to [Finger Lakes]. Once the gain is greater than $6,083,886.00, the Carried Interest will apply at the rates and distributions as specified by the various Operating Agreements at the various LLCs. Lastly, this agreement will continue in perpetuity and apply to all future investments at [Finger Lakes], including [Rethink Holdings] and all future investments . . . .

JX 82 at 1.

The day after receiving Mehta's second email, Lyrical invested $1,949,000 in Rethink Holdings. The parties executed the Rethink Agreement, which tracked the earlier agreements.

On April 25, 2008, Lyrical's then-controller, Kerilyn Fields, sent Mehta an email stating that the schedule listing the amounts subject to the Clawback Agreement omitted two loans of $250,000 to Tiber Holdings. Mehta responded the same day, saying he would "wrap them into the schedule." JX 83 at 1. He subsequently sent an updated spreadsheet that included them as debt, rather than as equity investments subject to the Clawback Agreement.

20

**K.    Management Fees Redux**

In early 2009, Mehta and Shalov revisited the issue of management fees by asking Keswin to have Lyrical pay $15,000 per month to help fund their salaries and Finger Lakes' operating expenses. When they had first approached Keswin, Mehta and Shalov promised that Lyrical would not have to pay a management fee, but they made that deal anticipating that their investments would work out, generate greater management fees, and result in liquidity events that would produce returns for everyone, including themselves. Reality had fallen short of their expectations.

Under the Term Sheet, Mehta and Shalov were entitled to take up to $150,000 each in salary. They had the potential to earn more if Finger Lakes generated profits and paid out dividends (with Lyrical receiving its 25% share), but that was not happening. None of the portfolio companies had achieved a liquidity event, and Finger Lakes was collecting approximately $400,000 per year in management fees. A significant amount of that went to operating expenses, meaning that Mehta and Shalov were only receiving their $150,000 salaries, if that. Although many people in New York City live on less than $150,000 per year, Mehta and Shalov saw themselves as financial professionals, and that level of compensation fell short of the rewards they associated with working in that sector.

Mehta and Shalov thought it was fair to ask Lyrical to pay a management fee. Because of the Clawback Agreement, Finger Lakes was operating more like an investment fund in which the risk of loss was borne across multiple investments. Fund investors routinely pay management fees. Although the ask conflicted with their original

pitch to Keswin, the original model envisioned a series of distinct investments in portfolio companies, each siloed as to profits or losses.

Despite Mehta and Shalov's arguments, Keswin refused to pay a management fee. He told Shalov and Mehta to get more money from the portfolio companies.

Having heard the parties testify and considered the record, I believe that Keswin expected Mehta and Shalov would take more money from the portfolio companies while still complying with the Term Sheet. The relevant paragraph of that document stated:

> [Finger Lakes] will be the entity through which [Mehta and Shalov] will conduct their business. The economics contemplated by this agreement will substantially survive any structural changes. [Mehta and Shalov] may take annual compensation of up to $150,000 each. Amounts in excess of this level will be added back for purposes of determining payments to the parties, which payments will generally be made as often as practicable, but no less often than annually.

JX 220 at 2. Finger Lakes also committed to "meet, at a minimum, quarterly with Lyrical to provide an update on the transactions where Lyrical has invested and/or sourced capital" and to provide Lyrical with "written summaries of its activities." *Id.* Given these provisions, Keswin reasonably believed that Mehta and Shalov would obtain any additional amounts through higher management fees, inform Lyrical of the additional amounts, and treat any compensation paid to Mehta or Shalov in excess of $150,000 per year as an advance against a profit distribution in which Lyrical would participate through its 25% ownership interest in Finger Lakes.

Mehta and Shalov interpreted Keswin's statement differently. They took it as a green light to draw compensation directly from the portfolio companies without disclosing it to Lyrical. In 2006, Shalov had started acting as Revolabs' regional sales

22

manager in New York. Shalov later assumed higher positions at Revolabs, first as "head of [U.S.] sales, and then global head of sales, and then senior vice president of business development" after Revolabs "saw that [he] knew what [he] was doing." Tr. 314-15 (Shalov). As head of U.S. sales Shalov "travel[led] all around the country selling our product to both dealers . . . [and] end customers" and had between five and ten people reporting to him. *Id.* at 318.

After Shalov became head of U.S. sales, Revolabs began paying Finger Lakes an additional $60,000 per year, which Shalov testified represented his compensation for that position. As Shalov assumed more responsibility, the payments to Finger Lakes grew. They eventually encompassed a salary of $240,000, a bonus of approximately $300,000, plus stock options ultimately worth $886,805.10.

Revolabs did not treat the payments to Finger Lakes as salary or bonus. Revolabs called them management fees. Within Finger Lakes, Shalov did not treat the money as his personal compensation either. He split it with Mehta.

While Revolabs was making the additional payments to Finger Lakes that Shalov described as his compensation, Revolabs continued paying its traditional management fee to Finger Lakes. That fee increased as the company's revenues grew, eventually reaching $240,000 per year. In total, Finger Lakes' receipts from Revolabs reached approximately $800,000 per year in cash, plus the options.

Starting in 2011, Shalov worked simultaneously as Vice President of Sales at Rethink. Rethink paid an incremental $120,000 annually to Finger Lakes, calling it a management fee. Shalov split the money with Mehta. Rethink continued paying Finger

23

Lakes its traditional management fee.

## L. The Proof Of The Investment Pudding

In total, Finger Lakes made investments in five portfolio companies: Performance, Portadam, Tiber, Revolabs, and Rethink. By 2006, the investment in Performance was a total loss. Finger Lakes continued to manage the other investments until early 2014. At that point, Lyrical exercised its right to take control of the special purpose vehicles. Addressed in the order that the investments were made, the status of the portfolio companies at the time of trial was as follows.

### 1. Tiber

Tiber fared poorly during the financial crisis of 2008 and required a loan from the Debt Fund. Tiber defaulted on its loan, and its business never recovered. The evidence at trial established that Tiber is unlikely ever to repay the loan.

After Lyrical took control of Tiber Holdings, Lyrical determined that there was no remaining value to Tiber's equity. Shalov and Mehta, however, control the Debt Fund. As of trial, they had not foreclosed on the Debt Fund's loan, nor had they agreed to any other resolution. Although Tiber has not officially been accounted for as a total loss, that is what it is.

### 2. Portadam

Portadam also fared poorly during the financial crisis of 2008 and required a loan from the Debt Fund. By early 2009, Portadam had defaulted on the loan, but the fracking boom in 2011 and 2012 enabled Portadam to refinance its loan with a third party lender.

When the fracking boom ended, Portadam's business suffered again. Facing the

24

prospect of default, Portadam tried to arrange a sale. Lyrical helped Portadam's CEO approach the most likely strategic buyer, but the effort failed. The CEO "saw the writing on the wall" and quit. Tr. 559 (Gage).

After Lyrical took control of Portadam Holdings in 2014, Lyrical determined that there was no remaining value in Portadam's equity. Lyrical contacted the third-party lender and arranged for a consensual assignment of Portadam's assets for the benefit of its creditors. Portadam Holdings received nominal consideration in exchange.

### 3. Rethink

As of the time of trial, it remained unclear whether Rethink would be a success or not. As with the other special purpose vehicles, Lyrical has taken control of Rethink Holdings.

### 4. Revolabs

Revolabs has been Finger Lakes' lone successful investment to date. In 2009, a buyer expressed interest in acquiring the company at a valuation of $30 to $50 million. Finger Lakes expected Revolabs to continue to grow and eventually sell for over $50 million.

In 2013, the Revolabs board of directors, which included Shalov and Mehta, fired the company's CEO. The board embarked on a sale process and, with the assistance of an investment banker, contacted sixty-seven potential bidders. On December 20, 2013, a buyer agreed to purchase Revolabs for $65 million.

Although the Revolabs investment resulted in a successful exit, it also led directly to this litigation. After being terminated, the ex-CEO called Keswin and told him that

25

Shalov and Mehta "were taking too much" in fees. Tr. 333 (Shalov). Keswin looked into the matter and learned that in addition to paying a traditional management fee, Revolabs was making payments to Finger Lakes that supposedly corresponded to Shalov's salary and bonus, and that Revolabs had issued stock options to Finger Lakes. Keswin became upset, which confused Shalov and Mehta. They thought—and reminded Keswin—that he had told them in 2009 to get more money from the portfolio companies. Keswin responded, "Yes, I remember that. But I didn't mean that much." Tr. 332 (Shalov).

The size of the management fees at Revolabs was the final straw for Lyrical. Under the operating agreements governing the special purpose investment vehicles, Lyrical's membership interests did not possess voting rights until the fourth anniversary after formation. Once that date arrived, however, Lyrical wielded a majority of the voting power in each entity. Ted Gage, Lyrical's CFO, previously had recommended taking over the special purposes vehicles as soon as Lyrical could do so. Gage had lost faith in Mehta in 2011, when Mehta asked Lyrical to provide additional funding for Portadam on short notice. He told Keswin that Mehta's behavior was "completely unprofessional" and that Mehta had failed to recognize Lyrical's concerns about language in a proposed agreement. JX 138 at 1. After the management fee revelation, Lyrical took control of each of the investment vehicles on February 25, 2014.

## M. The Dispute Over The Proceeds From The Revolabs Sale

In March 2014, the sale of Revolabs closed. For the first time, Revolabs Holdings had available cash to distribute to its members. Section 7.1 of the Revolabs Agreement governed the distributions of profits and losses. *See* JX 51 at § 7.1 (the "Distribution

26

Provision"). It stated that "[d]istributions of available cash of the Company shall be made to the Members" in accordance with the following priority:

(a) Return of Capital: First, one hundred percent (100%) to the Members holding Class A and Class B Membership Interests, pro rata in proportion to the amount of Class A and Class B Membership Interests held by each Member, until the cumulative amount of all distributions to each Member . . . is equal to the sum of the Capital Contributions made by Members holding Class A and Class B Membership Interests;

(b) Preferred Return: Second, one hundred percent (100%) to the Members holding Class A and Class B Membership Interests, pro rata in proportion to the amount of Class A and Class B Membership Interests held by each Member, until the cumulative amount of all distributions . . . is sufficient to provide each such Member . . . with a rate of return equal to six percent (6%) per annum compounded annually on the Capital Contributions of such Member . . . computed from the dates the Capital Contributions were made[;] . . .

(c) Common Return: Third, to the Members in accordance with the Common Sharing Percentage.

*Id.* (emphases omitted).

The Revolabs Agreement defined "Common Sharing Percentage" as follows:

(a) if at the time of any distribution to Members such distribution would result in a Class A IRR to Members holding Class A Membership Interests that is less than 15%; such distribution shall be allocated 85% to Members holding Class A Membership Interests and 15% to Members holding Class B Membership Interests, pro rata within each Class, based on the proportionate Membership Interests held by each Member within each Class; and

(b) if at the time of any distribution to Members such distribution would result in a Class IRR to Members holding Class A Membership Interests that is equal to or greater than 15%; such distribution shall be allocated 75% to Members holding Class A Membership Interests and 25% to Members holding Class B Membership Interests, pro rata within each Class, based on the proportionate Membership Interests held by each Member within each Class[.]

*Id.* at art. I.

27

As noted, the effect of these provisions was first to return invested capital, then to pay a 6% preferred return on invested capital, then to divide any remaining returns between the Class A and the Class B Members based on the Common Sharing Percentage. Under the Revolabs Agreement, as with all the portfolio company agreements, Lyrical held Class A Member Interests and Finger Lakes held Class B Member Interests. The Common Sharing Percentage changed the allocation depending on whether the investment had cleared a hurdle of 15% internal rate of return. If it had, then Finger Lakes would receive a 25% share of the returns. If it hadn't, then Finger Lakes would receive a 15% share of the returns.

The problem with the last step was that it assumed either that the Class B Member had not invested any capital or that Finger Lakes received Class A Member Interests in return for its invested capital. For Revolabs, Shalov and Mehta invested $100,000, but they did not document this investment by issuing themselves an appropriate number of Class A Member Interests. Instead, they simply added the amount contributed to the capital account to their Class B Member Interests. This method did not create any problems for the first two steps in the waterfall, which called for Shalov and Mehta to receive back their invested capital plus a preferred return. The problem arose under the third step, where the parties did not modify the Common Sharing Percentage to incorporate the concept that the Class B Member might have invested capital. The Common Sharing Percentage continued to divide the returns as if the Class B Member had invested nothing.

Mehta sent Lyrical an analysis calculating how he believed the distribution from

28

Revolabs Holdings would work. Gage prepared his own calculation, which differed from Mehta's.

Lyrical had taken control of Revolabs Holdings, so Lyrical controlled the distribution of funds. In August 2014, Lyrical used its authority to return capital to both itself and Finger Lakes. Lyrical also distributed $6,083,886 to itself, representing the amount of the clawback for the losses on Performance that Mehta had used in his calculation.

### N.      This Litigation

Finger Lakes filed suit on June 6, 2014, seeking an order compelling Lyrical to distribute the proceeds of the Revolabs sale in accordance with its interpretation of the Revolabs Agreement. Lyrical filed counterclaims that challenged Finger Lakes' interpretation of the Revolabs Agreement and sought to enforce the Term Sheet and the various clawbacks.

Both parties moved to dismiss, and Finger Lakes moved for partial judgment on the pleadings. On January 28, 2015, this court granted Finger Lakes' motion, holding that the plain terms of the Revolabs Agreement required Lyrical to distribute the funds initially in accordance with the waterfall set forth in that agreement. This partial ruling did not determine the outcome of the case, because genuine issues of material fact remained as to whether the parties' other agreements required Finger Lakes to redistribute to Lyrical a portion of the proceeds it otherwise would receive. The parties proceeded to trial to establish the scope of their obligations under their other agreements.

## II.    LEGAL ANALYSIS

This court's task is to determine how to allocate proceeds from the Revolabs sale. Although the Revolabs Agreement specifies initially how the proceeds flow to Lyrical and Finger Lakes in their capacities as members of Revolabs Holdings, the analysis does not end there. Lyrical and Finger Lakes entered into other agreements that operated across multiple investments. The Clawback Agreement and various sections of the Term Sheet apply after the initial distribution to Lyrical and Finger Lakes to reallocate the amounts each party otherwise would receive. In addition, under the Term Sheet, Finger Lakes owes Lyrical money for its unpaid share of management fees.[4]

---

[4] The parties have glossed over the question of what law governs the Term Sheet and the Clawback Agreement. Although Revolabs Holding is a Delaware LLC and the Revolabs Agreement selects Delaware law to govern its terms, the Term Sheet and the Clawback Agreement lack choice of law provisions. To determine the governing law, Delaware uses the "most significant relationship test" recommended by the Restatement (Second) of Conflict of Laws. *Deuley v. DynCorp Intern., Inc.*, 8 A.3d 1156, 1160-61 (Del. 2010). The obvious candidates are New York and Delaware. Keswin's negotiations with Mehta and Shalov took place in New York, where all three live and work. They reasonably should have expected that unless they chose the law of a different jurisdiction, New York law would govern their agreements. At the same time, they formed Delaware entities to implement their business arrangements. If they had formalized their overarching business relationship through a set of corporate governance agreements for Finger Lakes, then Delaware law would have governed the affairs of that entity. *See generally VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112-13 (Del. 2005). Had they drafted a separate agreement, such as a "Framework Agreement," they might have selected either state's law. Fortunately, the conflict is a false one, because both New York and Delaware enforce the plain meaning of agreements, apply similar principles of contract interpretation, and only look to extrinsic evidence in the event of ambiguity. *Rohe v. Reliance Training Network, Inc.*, 2000 WL 1038190, at *8 (Del. Ch. July 21, 2000) (Strine, V.C.). The parties have chosen only to cite Delaware cases, and this decision follows their lead.

## A. Governing Principles Of Contract Law

Under Delaware law, the party seeking to enforce a contract bears the burden of proving its existence by a preponderance of the evidence. *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 (Del. Ch. 2007). To prove that a valid contract exists, the party must show "(1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) [that] the parties exchange[d] legal consideration." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010). "When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

"The parol evidence rule bars the admission of evidence extrinsic to an unambiguous, integrated written contract for the purpose of varying or contradicting the terms of that contract." *Galantino v. Baffone*, 46 A.3d 1076, 1081 (Del. 2012). By implication, the parol evidence rule does not bar evidence of prior or contemporaneous agreements introduced for other purposes. A court may consider parol evidence to determine whether the parties intended a contract to be partially or completely integrated. *See Carlson v. Hallinan*, 925 A.2d 506, 522-23 & n.104 (Del. Ch. 2006). A writing is not completely integrated "if the writing omits a consistent additional agreed term which is . . . agreed to for separate consideration." Restatement (Second) of Contracts § 216 (1981). "Parol evidence may be admitted to prove the making of a contract . . . and to prove a collateral or separate agreement . . . ." *Scott-Douglas Corp. v. Greyhound Corp.*, 304

31

A.2d 309, 315 (Del. Super. 1973). The parties' performance or course of dealing is relevant to show the parties' intent. *Pharmathene, Inc. v. Siga Techs., Inc.*, 2011 WL 4390726, at *13 (Del. Ch. Sept. 22, 2011).

## B.     The Distribution Under The Revolabs Agreement

With two exceptions, the parties agree on how the Distribution Provision operates. They disagree over (i) whether the Distribution Provision should be reformed so that Lyrical would not receive 75% of the profits beyond the preferred return attributable to Shalov and Mehta's investment of $100,000, and (ii) whether the amount of distributable cash should be reduced to account for claims for indemnification in connection with this proceeding made pursuant to Section 4.4 of the Revolabs Agreement.

### 1.     The Reformation Argument

Finger Lakes did not plead or litigate a reformation claim. Finger Lakes nevertheless argued that the court should reform the Distribution Provision so that Lyrical will not receive 75% of the profits earned on the $100,000 in capital that Shalov and Mehta invested in the deal. If enforced as written, the Common Sharing Percentage will allocate cash between Lyrical and Finger Lakes without regard to Shalov and Mehta's investment. Judicial estoppel bars Finger Lakes from obtaining this remedy.

The evidence showed that the parties never agreed to give Lyrical an interest in the profits earned on Finger Lakes' capital. Lyrical admitted it would not be normal to receive such an interest and never sought one. Lyrical admitted that if the parties had identified the error, they would have corrected it. The Distribution Provision is obviously wrong, and the mistake resembles the situation that resulted in reformation in *Scion*

32

*Breckenridge*, although there the mistake favored the investment manager rather than the investor. *See Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665 (Del. 2013). As in *Scion Breckenridge*, the error arose from using a precedent agreement for a follow-on deal without modifying the waterfall to reflect different deal dynamics.

The problem for Finger Lakes is the doctrine of judicial estoppel, which "prevents a litigant from advancing an argument that contradicts a position previously taken that the court was persuaded to accept." *Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008). Finger Lakes sought and obtained partial judgment on the pleadings by arguing that the waterfall provision in the Revolabs Agreement was clear and unambiguous. Having obtained that ruling, Finger Lakes cannot now argue that the waterfall provision is erroneous and should be reformed.[5]

### 2. The Indemnification Claim

Finger Lakes seeks to recover all of the fees and expenses it incurred in this

---

[5] There were hints of another reformation theory at trial. Shalov testified that the Revolabs Agreement should have included a "management catch-up" that would have given Finger Lakes a preferential share of returns after the payment of the preferred return on invested capital but before the members began splitting returns using the Common Sharing Percentage. Although the details were vague, the idea seemed to be that Finger Lakes would receive distributions sufficient to give it the equivalent of Lyrical's preferred return. After that, the parties would split the incremental dollars. Some documentary evidence supported the existence of a management catch-up. *See* JX 88; JX 102. Finger Lakes did not pursue this claim in its post-trial brief, likely because Mehta testified at trial that Finger Lakes was not seeking the management catch-up. As with the request for reformation discussed in the text, the doctrine of judicial estoppel forecloses Finger Lakes from obtaining a remedy that would alter the terms of the Distribution Provision.

proceeding before the amount of distributable cash is determined. Section 4.4 of the Revolabs Agreement governs the indemnification and exculpation of members and managers. Section 4.4(a) states:

> To the fullest extent allowed by the [Delaware Limited Liability Company Act] and by other Applicable Law, the Company shall indemnify, defend against and hold harmless the Manager, in its capacity as manager of the Company, each Member, and the Manager's and each such Member's Affiliates . . . (each, each, [sic] an "Indemnitee") from, any expenses (including reasonable attorneys' fees and court costs), liabilities, claims, causes of action, losses or damages actually incurred by any such Indemnitee in connection with (i) any proceeding to which such Indemnitee is made a party or which such Indemnitee otherwise becomes involved in because such Indemnitee is or was a Manager or a Member of the Company . . . . The Company shall not be required to indemnify any Indemnitee for any costs, liabilities, claims, causes of action, losses or damages under this Section 4.4(a) to the extent the same arise from such Indemnitee's gross negligence or willful misconduct.

JX 51 at § 4.4(a) (emphases omitted).

Finger Lakes argues that it became "involved in" this action as plaintiff because it sought to enforce its rights as a member of Revolabs Holdings under the Distribution Provision. The plain language of Section 4.4(a) is not limited to parties who are named as defendants; it therefore includes covered actions by plaintiffs. *See Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 344 (Del. 1983) ("[I]ndemnity is not limited to only those who stand as a defendant in the main action.").

In my view, Finger Lakes' right to indemnification extends only to fees and expenses through January 28, 2015, when I granted judgment on the pleadings in its favor. That portion of the action involved Finger Lakes' status as a member and its effort to compel a distribution in that capacity under the Distribution Provision. Once I entered

that order, the remaining issues in the case turned on the implications of the Term Sheet and the Clawback Agreement. Those agreements did not govern Finger Lakes' rights as a member of Revolabs. They rather were part of the overarching business deal between Finger Lakes and Lyrical that operated across multiple investments. Consistent with this interpretation, Lyrical has sought indemnification for $137,043 in legal fees it incurred as Manager through the grant of judgment on the pleadings. Lyrical has not sought amounts after that point.

Finger Lakes claims to have incurred $339,546.86 in legal fees and expenses through January 28, 2015. Of that amount, $136,969.25 is owed to the Kagen Law Firm and Ashby & Geddes. Another $202,577.61 is owed to DLA Piper for a pre-litigation investigation and unsuccessful negotiations with Lyrical.

Section 4.4(a) contemplates indemnification for "reasonable" attorneys' fees and expenses. Lyrical correctly observes that the amounts due to DLA Piper are unreasonable and excessive for the nature of the work claimed. Lyrical represented that its own attorneys incurred approximately $10,000 on the same tasks. By contrast, the amounts the two sides incurred for actual litigation tasks are remarkably close ($137,043 versus $136,969). Having presided over the case, including the portion that resulted in the grant of partial judgment on the pleadings, I believe that approximately $137,000 is a reasonable amount to have incurred during that phase.

Assuming for the sake of argument that Section 4.4(a) did cover fees and expenses incurred litigating issues under the Term Sheet and the Clawback Agreement, then Finger Lakes still would not be entitled to indemnification. Section 4.4(a) denies indemnification

35

to a party that engages in "willful misconduct." Mehta and Shalov knew about the Term Sheet and Clawback Agreement and willfully refused to comply with their terms. Indemnification is not available to them.

### 3.    The Calculation Under The Distribution Provision

The sale of Revolabs generated proceeds of $31,284,216.07 for distribution by Revolabs Holdings. A true-up provision resulted in additional funds of $45,591.74, increasing the amount to $31,329,807.81. After trial, $895.34 remained in escrow. Lyrical incurred $137,043 in fees and expenses that were subject to indemnification under Section 4.4(a), and Finger Lakes incurred $136,969.25. After excluding the escrow (which is not yet available for distribution) and deducting the indemnification amounts (which shall be paid separately to the parties), the net amount available for distribution is $31,055,795.56.

Subsections (a) and (b) of the Distribution Provision call for the following distributions to Lyrical and Finger Lakes:

| Available Funds | |
|---|---:|
| Return of Capital to Lyrical | $4,600,000 |
| Return of Capital To Finger Lakes | $100,000 |
| Preferred Return to Lyrical | $2,526,822 |
| Preferred Return to Finger Lakes | $65,531 |
| **Total Distributions** | $7,292,353 |
| **Remaining Funds** | $23,763,442.56 |

Subsections (c) of the Distribution Provision calls for the remaining funds to be distributed according to the Common Sharing Percentage, which in this case allocates 75% to Lyrical (the "Investor Share") and 25% to Finger Lakes (the "Manager Share"). The Investor Share is $17,822,581.92. The Manager Share is $5,940,860.64.

36

Assuming I were to adjust the Common Sharing percentage to reflect Shalov and Mehta's capital, I would award them a *pro rata* allocation of the Investor Share. Lyrical invested $4,600,000; Shalov and Mehta invested $100,000. Lyrical therefore would receive 97.87% of the Investor Share, and Finger Lakes would receive an incremental 2.13% of the Investor Share, or $379,203.87. Of the residual funds, Lyrical would take $17,443,378.05, and Finger Lakes would receive $6,320,064.51.

Using the unadjusted shares called for by the Common Sharing Percentage, Lyrical's total distribution, encompassing its return of capital, preferred return, and the unadjusted Investor Share, would be $24,949,403.92. Finger Lakes' total distribution, calculated on the same basis, would be $6,106,391.64.

## C. The Cross-Investment Agreements

The discussion in the preceding section identified the distributions that Lyrical and Finger Lakes would receive as members in Revolabs Holdings, but that is only the initial step in the analysis for purposes of this case. There were other agreements between the parties that operated across investments.

### 1. The Revolabs Agreement Did Not Supersede The Term Sheet Or The Clawback Agreement.

The primary issues litigated at trial did not involve the Revolabs Agreement itself, but rather what other agreements existed between the parties and whether those contracts survived the execution of the Revolabs Agreement. When granting Finger Lakes' partial motion for judgment on the pleadings, I ruled that the integration clause in the Revolabs Agreement caused it to supersede all prior and contemporaneous agreements within its

37

scope. The question for trial was the scope of the Revolabs Agreement and whether it superseded portions of the Term Sheet affecting the parties' overarching business relationship. Finger Lakes claimed it did, such that Finger Lakes was not bound by provisions of the Term Sheet or the Clawback Agreement. The record proved it did not.

The plain language of the integration clause in the Revolabs Agreement stated that it superseded all prior agreements "with respect to the subject matter hereof." JX 51 at § 9.6. The "subject matter hereof" was the investment in Revolabs. As with all of the special purpose vehicles, the scope of the governing agreement did not extend to the ongoing business relationship between Finger Lakes and Lyrical. None of the operating agreements superseded the provisions of the Term Sheet addressing the parties' overarching business deal, such as Lyrical's right of first refusal, its 25% equity interest in Finger Lakes, the management fee cap and split, or the cap on Mehta and Shalov's salary.

Contrary to Finger Lakes' arguments in this case, Mehta and Shalov never believed that the individual operating agreements superseded the Term Sheet. As described in the Factual Background, they abided by the Term Sheet. They offered Lyrical the right of first refusal on new deals because it was "part of [their] overall agreement." JX 53 at 1. They asked Keswin for the right to take more in salary because the Term Sheet imposed a cap. Mehta even adhered to the Term Sheet when preparing his analysis of the distributions from Revolabs. His calculations awarded Lyrical 25% of the carried interest from the sale because the Term Sheet gave Lyrical a 25% interest in Finger Lakes.

The lack of any pre-litigation evidence that anyone thought the Term Sheet had been superseded makes sense, because that would have been an absurd result. Recall that Lyrical and Finger Lakes negotiated the Performance Agreement, which formed the model for all of the operating agreements, just after they negotiated the Term Sheet. Although Lyrical drove a hard bargain and extracted numerous concessions in return for acting as Finger Lakes' seed investor, Shalov and Mehta achieved their goal. They obtained access to capital from a successful investment firm with a strong reputation. If the integration clause in the Performance Agreement had the effect Finger Lakes now claims, it would have wiped out the Term Sheet and everything Shalov and Mehta had achieved. They never intended for that to happen. The law will not enforce an unreasonable interpretation that "produces an absurd result or one that no reasonable person would have accepted when entering the contract." *Osborn*, 991 A.2d at 1160.

Because the integration clause in the Revolabs Agreement does not supersede the provisions of the Term Sheet that governed the parties' ongoing relationship, Finger Lakes remains bound by the provisions that gave Lyrical (i) a 25% interest in Finger Lakes and (ii) a right to a portion of the management fees earned by Finger Lakes. Any amounts that Finger Lakes otherwise would receive from Revolabs Holdings must be adjusted to reflect these agreements.

The same is true for the Clawback Agreement. As discussed in the Factual Background, Lyrical proved the existence of the Clawback Agreement. Although it is impossible to determine the exact date when agreement was first reached, or the precise moments when it subsequently was expanded, "[a] manifestation of mutual assent may be

39

made even though neither offer nor acceptance can be identified and even though the moment of formation cannot be determined." Restatement (Second) of Contracts § 22(2). Shalov, Mehta, and Keswin objectively manifested their agreement on the Clawback Agreement and subsequent modifications through email exchanges and their course of dealing.

Finger Lakes did not challenge the adequacy of consideration for the formation of the Clawback Agreement, which Lyrical negotiated for as a condition to making the original loans to Performance, but Finger Lakes did contend in this litigation that Mehta and Shalov agreed to extend the Clawback Agreement gratuitously. Traditionally, parties had to provide separate consideration to modify a contract. *JBR Contrs., Inc. v. E & W, LLC*, 991 A.2d 18, 2010 WL 802076, at *1 n.4 (Del. 2010) (TABLE). Under the modern view, consideration is no longer required if the modification is made in good faith and is "fair and equitable in view of circumstances not anticipated by the parties when the contract was made." Restatement (Second) of Contracts § 89. Assuming the traditional rule continues to govern under Delaware law, Shalov and Mehta agreed to expand the Clawback Agreement to induce Lyrical to invest additional capital, which Lyrical had no obligation to do. Each time that they agreed to expand the Clawback Agreement it was in connection with a request for more money.

Just as the integration clause in the Revolabs Agreement did not supersede the cross-investment provisions in the Term Sheet, it did not supersede the Clawback Agreement. The Revolabs Agreement specified how to distribute proceeds to Finger Lakes and Lyrical in their capacity as members. That agreement did not speak to or

40

supersede overarching agreements that applied across investments once each party received its share of the proceeds.

### 2. The Clawback Agreement

The parties disagreed about the scope of the Clawback Agreement. The evidence at trial proved that it extended to all of the equity investments that Lyrical made, plus $2,650,000 in principal that Lyrical loaned to Performance, plus $983,886 that the Debt Fund loaned to Performance.

When Lyrical and Finger Lakes originally were quantifying the amount of the Clawback Agreement, the only loss to date on the equity investments was at Performance Holdings. Since then, Lyrical has suffered a total loss on its equity investments in Portadam and Tiber Holdings. Accordingly, the Clawback Agreement covers the following losses:

| Investment | Amount Of Loss |
|---|---|
| Performance Equity | $2,450,000 |
| Performance Debt (Principal Only) | $2,650,000 |
| Performance Loan from Debt Fund | $983,886 |
| Tiber Equity | $3,328,270.46 |
| Portadam Equity | $ 3,950,000 |
| Total | $13,362,156.46 |

The Clawback Agreement does not extend to any loans other than the loans that Lyrical made to Performance. Except for the loan that the Debt Fund made to Performance, the Clawback Agreement does not extend to losses incurred by the Debt Fund. The Debt Fund's losses are covered by the Debt Fund Clawback, which applies only to Finger Lakes' carried interest in the Debt Fund. Lyrical has asked for an order compelling Finger Lakes to pay its carried interest in the Debt Fund to the investors in the

41

Debt Fund, but that issue was not litigated in this case.

The total amount of losses that Finger Lakes must repay under the Clawback Agreement before Finger Lakes will receive any carried interest is thus $13,632,156.46. As previously explained, the amount of the allocation to Finger Lakes from the unadjusted Investor Share and Manager Share is $5,940,860.64. Because the clawback amount exceeds Finger Lakes' distribution, Finger Lakes is not entitled to receive anything from Revolabs other than its capital of $100,000 and preferred return of $65,531. The clawback amount is reduced to $7,255,764.82.

### 3.      The Management Fee Split

A related issue is the split of management fees. The parties disagreed about how the split worked. Separately, Finger Lakes contended that Lyrical cannot claim any share of its management fees because of the doctrines of laches and acquiescence.

Under the Term Sheet, the management fee split depended on the source of the fees. When Lyrical and Finger Lakes negotiated the Term Sheet, Finger Lakes already was receiving a management fee from Tiber, and the contemplated investment in Performance called for a management fee. For these portfolio companies, the Term Sheet specified that Lyrical would receive 50% of any management fees above $325,000. The management fees from Performance and Tiber never exceeded the minimum $325,000 threshold, so there was nothing to share with Lyrical.

For other investments, the Term Sheet incorporated the management fees into the GM Stake. That term captured the total return that Finger Lakes would receive from a portfolio company, whether through its carried interest or via management fees. As

discussed in the Factual Background, the percentage of the GM Stake that Lyrical received depended on the amount of funding that Lyrical provided. For Revolabs, Portadam, and Rethink, Lyrical was entitled to 25% of the GM Stake.

The following table shows the amounts that Finger Lakes received from Revolabs, Portadam, and Rethink. Included in these amounts are (i) $886,805.10 that Finger Lakes received in 2014 by exercising stock options in Revolabs, (ii) $50,000 from Revolabs for a "Capital Raise Fee" in 2006, and (iii) amounts that Shalov claimed were paid by Revolabs and Rethink as his salary and bonus for filling employee positions at those companies.

| Year | Revolabs | Portadam | Rethink | Total |
|------|----------|----------|---------|-------|
| 2004 | $0 | $30,000 | $0 | $30,000 |
| 2005 | $0 | $120,000 | $0 | $120,000 |
| 2006 | $50,000 | $119,926 | $0 | $169,926 |
| 2007 | $77,209 | $140,000 | $0 | $217,209 |
| 2008 | $199,655 | $135,000 | $0 | $334,655 |
| 2009 | $272,502 | $150,000 | $0 | $422,502 |
| 2010 | $554,500 | $150,000 | $0 | $704,500 |
| 2011 | $714,796 | $150,074 | $66,789 | $931,659 |
| 2012 | $480,000 | $205,000 | $121,782 | $806,782 |
| 2013 | $799,829 | $180,000 | $165,412 | $1,145,241 |
| 2014 | $1,016,405 | $45,000 | $101,583 | $1,162,988 |
| **Total** | $4,164,896 | $1,425,000 | $455,566 | $6,045,462 |

To put these amounts in context, Lyrical invested a total of $10 million in Portadam, Rethink, and Revolabs. Finger Lakes withdrew a total approximately $6 million, with $4.75 million of that coming out in the last five years of the relationship.

Finger Lakes has argued that the bulk of the management fees comprised compensation paid to Shalov for filling positions at the companies. That recharacterization was pretextual. The amounts were management fees. The portfolio

companies paid the amounts to Finger Lakes as management fees, and Mehta and Shalov split them as if they were management fees. Finger Lakes even labeled them "management fees" in its contemporaneous records. Moreover, a management fee is, by definition, compensation for services rendered. A management fee is not a gift to the investment manager, nor is it a tax on the portfolio company. The management fee compensates the asset manager for providing services to the portfolio company. Everything Mehta and Shalov testified that they did at the portfolio companies (trying to increase sales, improve their financial management, and renegotiate their loans) was consistent with and part of Finger Lakes' role in managing its assets to maximize their value.

In the Term Sheet, Lyrical negotiated to receive a portion of the income stream that Finger Lakes would generate, whether the income came in the form of carried interest or management fees. Lyrical negotiated restrictions to block attempts to circumvent the income sharing provision, including by requiring Mehta and Shalov to conduct their business through Finger Lakes. Mehta and Shalov could not dodge the income sharing provision simply by calling the fees by a different name.

Finger Lakes argues that laches bars any claim for management fees that accrued and were due more than three years before Lyrical filed its counterclaims on August 15, 2014. This argument does not apply to the $3,535,573 in fees that accrued after that date. Lyrical can rely on the earlier amounts, which total $2,509,889, to support its affirmative defenses of recoupment and setoff, to which laches does not apply. *See Atkins v. Hiram*, 1993 WL 287617, at *1 (Del. Ch. July 26, 1993) ("[A] statute of limitation is not

applicable to an affirmative defense . . . ."); *Del. Chems., Inc. v. Reichhold Chems., Inc.*, 121 A.2d 913, 918 (Del. Ch. 1956) (granting defendant leave to replead otherwise time-barred setoff counterclaim defensively).

Finger Lakes also invokes the defense of acquiescence. This doctrine applies when a plaintiff "has full knowledge of his rights and the material facts and (1) remains inactive for a considerable time; or (2) freely does what amounts to recognition of the complained of act; or (3) acts in a manner inconsistent with the subsequent repudiation, which leads the other party to believe the act has been approved." *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (internal quotation marks and citation omitted). Acquiescence does not apply on these facts because Lyrical did not have "full knowledge of [its] rights and the material facts." Although Lyrical knew under the Term Sheet that it had a right to a payment of its share of the management fees "no less often than annually," JX 220 at 2, Lyrical did not know the specific details about the fees that Finger Lakes was charging until 2013, when Keswin investigated after he received the tip from Revolabs' former CEO. Keswin's statement in 2009 that Shalov and Mehta should "get more money" from the portfolio companies did not amount to acquiescence. No reasonable observer would infer that Keswin had handed Shalov and Mehta a blank check or that they could take as much as they wanted. A reasonable observer would understand that because of the Term Sheet, Keswin believed that Shalov and Mehta would keep him informed and pay Lyrical its share of the additional management fees. Under that scenario, Keswin would have had the opportunity to step in if the fees became excessive.

In total, Finger Lakes received $6,045,462 from Portadam, Rethink, and Revolabs. Lyrical was entitled to 25%, or $1,511,365.50. Of that amount, Lyrical asserted a timely claim for $883,893.25. Lyrical can rely on the remaining $627,472.25 only as an offset or for purposes of recoupment.

But for Lyrical's management fee claim, Finger Lakes would be entitled to $165,531 from Revolabs Holdings, representing a return of its capital and the preferred return. Lyrical shall receive this amount as an offset to its management fee claim of $883,893.25, which reduces Finger Lakes' liability for management fees to $718,362.25.

## D. The Keswin Loan

As noted in the Factual Background, Keswin personally loaned $400,000 to Finger Lakes. Shalov and Mehta guaranteed the loan, and it was secured by Finger Lakes' interests in Performance, Tiber, and Portadam Holdings. Before trial, Finger Lakes argued that Keswin could not pursue this claim because he was not a party to the action and Lyrical lacked standing to assert his rights. Keswin elected not to dispute the issue and brought a separate action in New York. In its post-trial brief, Finger Lakes argued that judgment should be entered in its favor on the claim. That argument is unfounded. The parties to the Keswin Loan are free to litigate the claims relating to the loan in New York.

## III.    CONCLUSION

Read together, the Term Sheet, the Clawback Agreement, and the Revolabs Agreement govern the distribution and allocation of the proceeds from the Revolabs sale. Revolabs Holding shall pay $137,043 to Lyrical and $136,969.25 to Finger Lakes as

indemnification for legal fees and expenses. Lyrical is entitled to the remaining proceeds from the Revolabs sale. Finger Lakes receives a credit of $5,940,860.64 against the total amount that Lyrical could recover under the Clawback Agreement, leaving a net amount subject to potential clawback of $7,255,764.82. If Rethink achieves a liquidity event, the remaining clawback amount will come into play, as will the $627,472 in management fees that Lyrical did not timely assert and which it can raise only as an offset or for purposes of recoupment.

Separately, judgment will be entered in favor of Lyrical and against Finger Lakes in the amount of $718,362.25, representing the remaining portion of Lyrical's share of the management fees for which Lyrical asserted a timely claim. Pre- and post-judgment interest is due on this amount at the legal rate, compounded quarterly, from the date on which the underlying management fee payments were due. A payment equal to Lyrical's share of management fees generated during a given year shall be deemed due on the last day of Finger Lakes' fiscal year, unless the parties agree on an alternative methodology.

Lyrical is entitled to court costs as the prevailing party. Subject to the ruling regarding indemnification, the parties otherwise will bear their own fees and expenses. The parties will advise the court as to any remaining issues that need to be addressed. If there are none, Lyrical will prepare and submit a form of final order upon notice to Finger Lakes.